Yes, sir. Number 20-21-76, Virginia Hospital & Healthcare Association v. Karen Kimsey. Mr. Kimberley? Good afternoon, Your Honor. My name is Michael Kimberley and I represent the appellants in this case. Your Honors, I'd like to begin with a clarification that I think is pretty crucial to our takings claim. A successful takings claim has two elements. First, a taking of private property for public use, and then second, an analytically distinct denial of just compensation for that taking. The Supreme Court's decisions in Nick v. Monsanto both confirm that the Fifth Amendment forbids only the denial of just compensation after a taking has occurred, and it doesn't forbid the taking itself. So those cases both hold that an injunction barring a taking from occurring generally will be inappropriate when a damages remedy, which is to say just compensation, is available in a suited law. Are we clear at this point that your action arises under Section 1983 and not under the Supremacy Clause? Yes, Your Honor. I think that's certainly true of the takings claim. I think it's true of the preemption claim as well. As to the takings claim, which is a constitutional claim arising under 1983, we are not seeking an injunction against the taking, which is what the Supreme Court was concerned about in Nick v. Monsanto. Rather, we're asking for an injunction against a state law that systematically denies just compensation for the taking. Counsel, this is your theory that EMTALA is the taking, and you're not trying to enjoin that. You're just trying to enjoin these state budget items?  Okay. But then why are you suing Virginia? If the federal government, EMTALA is a federal mandate, a federal statute, why does Virginia – it just seems to me like you might be suing the wrong defendant. You can't kind of mix and match your sovereigns that way, can you? Well, I think in the Medicaid context – I wouldn't call it mixing and matching, but although EMTALA is a federal statute, DMAS is the appropriate defendant. And it's because when a statute like EMTALA takes private property from doctors and hospitals for public use, as it does, doctors and hospitals are entitled to just compensation. And when the patient who is receiving the EMTALA-mandated care is covered by Medicaid, that compensation is determined and provided through a program, through the Medicaid program itself, which is administered jointly by state and federal authorities. So fine. So sue the federal government and say that your joint operation with Virginia isn't giving us back what you took from us with EMTALA. It seemed like the 11th Circuit addressed this in that Baker case, and they said you can't do this. If it's the federal government – or there I think it was the state government – that is requiring the care, you can't sue the other sovereign for failure to provide the just compensation. What I would say, Your Honor, is that Medicaid is really the quintessential example of cooperative federalism. It is a program that is administered by both state and federal authorities working together. Is both state and federal money involved? That's correct, isn't it? That is true, Your Honor. Majority of the money used to fund Virginia's Medicaid program is federal money, but it is, as part of the joint program, the cooperative nature of the program, it is funded jointly by state and federal authorities. The state has put up a certain percentage of it. That's exactly right. And they passed these state statutes to save state money. To save state and federal money, yes, Your Honor. To save money for the Medicaid program in Virginia overall, funded by both. By paying less for emergency room visits. That's exactly right. You say there that it was passed over the veto of the governor? They had a special session to do that? Your Honor, it was part of a special session, and this was an artifact of the pandemic. It was a special session that had come together to override certain vetoes that had taken place, but the legislature undertook an emergency budget measure that included the budget items at that time. Okay, but now they required these, you say they required the down coding provision requires them to judge the delivery of services based on the diagnosis. That's correct. Rather than, what's the term when they go in? The other term? It's symptoms. It's symptoms versus diagnosis. Symptoms versus diagnosis. And you say the federal code requires them to be judged on the symptoms. Now, the state law says it could be on the diagnosis, which means they can pay less. That is true, Your Honor. If my wife thinks I'm having a heart attack and takes me down there and they decide I don't have a heart attack, then they down code and base it on the symptoms, right? Well, they do, Your Honor. I want to be clear, though, that this statute is not purporting to carve out presentations that aren't truly emergencies. What it's doing instead is making a policy judgment that some emergency conditions really are preventable and would be better treated earlier on with preventive care. Everybody would agree with that, wouldn't they? Nobody disagrees with that. No, of course, that's true. Although, the point from the perspective of doctors and hospitals dealing with emergency room patients is whether or not it would be preferable that the condition were avoided with preventive care. Once an individual presents in the emergency room, the doctor and hospital are bound to provide the emergency care. And so this isn't a circumstance. But they're also bound by federal law to make the records reflect correctly what they're supposed to reflect. Well, that's exactly right. And that's precisely what's problematic with the budget. I mean, what jumped off the page with me with this state statute is it seems to me like they're mandating the falsification of records. Your Honor, that's a point that we made in our reply brief. And I think the way that the state is approaching its description of the way this program works is exactly that. And, of course, if that's what were going on and there were falsification of records going on, we wouldn't be here suing to defend the conduct of our doctors and hospitals. I do want to be sure to come back, if I may, to Judge Harris's question because I think it's an important one. In the context of a joint program like this, really the question is who bears the responsibility to furnish just compensation? The fact that this is a joint program doesn't absolve the state government entity, which is effectively playing the role of agent on behalf of the federal government insofar as it's allocating federal dollars. Counsel, I guess I think I sort of understand what you're saying, but it does seem to me like this is sort of an issue for your case, the two different entities here. And I don't see any of this in your complaint. I think that the district court thought, and I understand why the district court thought this based on your complaint, that you were saying that the taking was affected by these Virginia reimbursement rates. That you had an investment-backed expectation that gave rise to a property interest in the reimbursement rates themselves. And then the district court just said, well, you can't enjoin that, as we all agree, you can't enjoin the taking itself, so you can't get an injunction. And I don't really see the part in your complaint where you explain all of this, no, no, EMTALA is the taking. We're not trying to enjoin that, we're trying to enjoin the state of Virginia for not reimbursing us or compensating us for a taking that has been effectuated by the federal government. And that might sound weird, district court, but let me explain to you why, in the context of this joint partnership, we actually have the right defendant. I feel as though we're getting some of this for the first time on appeal. Your Honor, I… Yeah, go ahead. That is assuredly not the case, and I don't have a pin site at the moment, but I will in the time that I have between now and my rebuttal get the pin sites. It was raised both in the briefing on the preliminary injunction and in the motion to dismiss, and it was the topic of extensive discussion at the oral argument. So there's no question, this is the theory that was before the judge. We made very, very clear that our position was not that we had a property right in the reimbursements ourselves. Our position was consistent with the Ninth Circuit's decision in Sierra Medical that our property right is the right in our, in doctors and hospitals, real property in the professional services and the supplies that they use in these encounters. And that the taking is happening because DMAS is taking, in effect, level four services, but reimbursing only that portion that corresponds with a much, much less intensive level one service. You know, level four services would include presentations like heart failure or blood in the urine, severe acute asthma. These are all serious conditions requiring significant professional time, testing… Counsel, I'm sorry, I'm looking at your brief, which explains that the budget items have the character of an unconstitutional taking because the budget items interfere with your investment-backed expectations and your property interests. I mean, you'll get me the pin sites. I don't want to belabor the point. Yeah, and Your Honor, I'll acknowledge that some of the earlier briefing was a little bit imprecise at times in describing what was the taking and what was the denial of just compensation. And, you know, candidly, it's because many of the cases themselves often allied those two elements, and it's why I started out with the clarification about the analytical distinction between the two. But as I say, I'll get you those pin sites to make clear that, as I say, this was the theory that we were arguing before the district court. So I do, along these same lines, want to be clear that we stipulate for purposes of this lawsuit that the standard reimbursement rates set by DMAS for particular services represent just compensation. This case is not about just below-cost reimbursements, and DMAS really can't disagree with this position because, of course, they're the ones who set the standard rates and determine that those rates are sufficient and reasonable to reimburse the service. So our point is only that once DMAS has determined what a reasonable just compensation… You've got a lot of acronyms running around this case. DMAS is Virginia. That's right. DMAS is the Virginia agency that administers the Virginia Medicaid program. I can call it the state if that's easier, Your Honor. Everybody throws these acronyms around. We get them all the time in these cases. It's hard to keep them straight. I understand, Your Honor, and I'll reduce my… So our point is only that once the state has determined what reasonable compensation is for a legally mandated care, it must actually give that level of compensation. It can't pretend counterfactually that the services furnished were different, that they were less complex or less expensive. And federal law requires that. Is that what you're saying? And federal law requires that, Your Honor. And federal law requires that. The federal law that requires that is statutory law and regulations. That's correct, Your Honor. It's both EMTALA itself and the prudent layperson standard embodied in EMTALA, and it's also U2B2, Section 1396 U2B2, which provides that state Medicaid agencies must ensure, quote, shall require coverage for emergency services, where in turn emergency services is defined to mean the services needed to evaluate and stabilize an emergency medical condition, which in turn is defined according to the prudent layperson standard, which is, Your Honor, mentioned earlier, is defined entirely based on presenting symptoms and not diagnoses. And so… And you're claiming that the Virginia legislature has repealed part of the federal code and the federal regulations. That's… And superseded. That's correct, Your Honor, that the down-coding provision… And that's how you get into claiming that the Supervisory Clause was triggered. Well, I wouldn't say that it's a claim that arises under the Supremacy Clause. It implicates the Supremacy Clause in the sense that any preemption claim ultimately turns conceptually on the Supremacy Clause. But I think after Anderson, it's clear that this is a 1983 action. Let me ask a question. If we do reach the merits of this whole taking, the merits of taking, what kind of taking do you say this is? Is it a physical taking, a per se regulatory taking, or what bucket do you say this is in? Yeah, I think it's a per se regulatory taking and also a physical taking. The per se regulatory taking follows from the permanent invasion on real property and improvements, and I think also from the taking of professional services. You know, if a physician sells her knowledge and skill and time just like a manufacturer sells widgets, it would be a per se taking to take the widgets. It's a per se taking to take a physician's professional services as well. All right, I see I'm out of time. I'm happy to come back and rebuttal. Thank you, Mr. Kimberly. You've saved some rebuttal time. Ms. Kalin. Good afternoon, Your Honors, and may it please the Court, Michelle Kalin for Karen Kimsey. Before jumping into the wheeze, I think it's important at the onset to clarify what this program does and what it does not do. First, all Virginia has done here is announce that going forward for treatments that take place after July 1, 2020, Virginia's Department of Medical Assistance Services, DMAS, will reimburse certain emergency room services differently under Medicaid and will reimburse differently certain hospital readmissions. That is, if someone with conjunctivitis walks into the emergency room and receives an MRI, a CT scan, and sees five different experts, and the hospital bills this out for level four reimbursement under Medicaid, the hospital will receive level one reimbursement. So Virginia has not announced that it will decline Medicaid reimbursement altogether, nor has it enacted any retroactive policy. It simply announced that it will reimburse services after July 1, 2020, at a different Medicaid rate. Second, this is not about denying anyone service or falsifying any records. It is about better matching the reimbursement to meeting a patient's actual need. No one is being turned away from treatment, and standards of care still assure that people with emergency needs receive emergency care. This program is simply about assuring that people who are better treated outside the emergency setting receive the more appropriate treatment, such as a primary care provider. Finally, even if we are wrong about all of this, the trade associations have the recourse that Congress created for them. If CMS, the federal agency tasked by Congress to administer Medicaid, concludes that we are wrong, it can deny the proposed amendments to Virginia's state plan. And if a state still does not comply, the HHS Secretary can withhold Medicaid funding. If CMS approves the amendments to Virginia's state plan, then the trade associations, if they disagree with CMS's conclusion, they have recourse under the APA, as the Supreme Court explained in Douglas. All parties to this case recognize that there is a problem with over-utilization of emergency rooms. They merely disagree about the right policy for addressing that problem. But the takings clause is not a vehicle for private litigation over health care policy. Delving into the takings clause, the framing of the trade association's case is premised on a fundamental misunderstanding of the takings clause and how it works. Unlike the due process or equal protection clauses, the takings clause does not protect people against certain activity. That is, it does not protect people against the taking itself. It simply entitles certain people to just compensation for a taking. That is why, in general, claims for injunctive relief are not properly brought as takings claims. The appropriate relief for a takings claim... Are you all applying the prudent layperson standard in Virginia? Since July 1st? Yes. We are not violating the prudent layperson standard. But I think the operative point with regard to the... You're not violating it. You're downcoding from the prudent layperson standard, correct? No, Your Honor. The prudent layperson standard... So I think as an initial matter, in order to even get to the prudent layperson standard, there has to be a right established to set the stage for the cause of action here. And for all the reasons we lay out in our brief, that's not the case. But I think CMS is the entity tasked by Congress to evaluate whether or not a state's proposed plan violates the prudent layperson standard here. And what the plaintiffs here ask this court to do is jump in front of CMS before that evaluation. But our view is... Counsel, this is Judge Harris. You've alluded several times to the fact that CMS hasn't yet decided whether to approve this. And I think you suggest in your brief that maybe someone should be holding this in abeyance. Were we to get this far in the analysis, that before reaching the merits of the preemption claim, we should hold this in abeyance? Is that us, the district court? Are you saying it's not right or just that we could decide it but we shouldn't? I don't quite understand what you want us to do with this pending CMS approval factor. Certainly, Your Honor. I think holding the case in abeyance is an option. And I think the discussion... And what does CMS mean? That's another one of those acronyms that get thrown around. See, that's a federal agency or a federal committee or something, right? That's correct, Your Honor. It's the Federal Center for... I'm getting the exact... Yeah, you don't know what it is either. I can't keep up with it. I'm glad to know that you all can't keep up with it either. It's the Centers for... It's the entity of the federal government that's supposed to decide whether what the state's doing in this Medicaid program is permissible under federal law. That's correct, Your Honor. And what you all have done in the legislature, effective 1 July, is presently pending before the CMS. That's correct, Your Honor. But why don't you all wait until they decide it? We would be certainly fine with waiting until that's decided, Your Honor. Well, why don't you agree... Then will you agree right now to hold these changes in abeyance pending resolution of this by CMS? No, Your Honor. We would certainly agree to hold the case in abeyance. But the way that the... You're applying your changes effective 1 July 2020. So they've been in effect for eight months. That's what the other side's complaining about. And the doctors and the hospitals aren't... They say they're not getting paid what they're supposed to getting paid, and therefore there's a taking of their work. The doctors and the hospitals aren't getting paid what they think they should be getting paid because you all are applying this downcoding provision, for example. And they have... And that's costing them... That's a taking of their earnings. And that has appealed to me. I remember when we had a problem in West Virginia when I used to... When I was a lawyer years and years ago, they had a... We had a system, and I won't charge you for this time for listening to me. We had a system where they paid court-appointed lawyers $50 for a felony case, period. And you went to trial for a week or two weeks, you got $50. And a lot of us did it. Everybody had to take the appointments, and we got $50. The Supreme Court of West Virginia ruled in favor of a challenge that that violated the takings clause. Lo and behold, that was the work product of the lawyers being taken for nothing, for $50. And they had to come up with another plan for court-appointed lawyers, and they had to pay them by the hour. And they had to pay them some expenses, and they had to give them some opportunities to hire experts and things like that. But anyway, in studying this case, I immediately thought that these doctors in the emergency room, they say you're taking their property, their services. That's what the claim is, as I understand it. And CMS is supposed to be looking at this thing now and trying to figure it out, and they haven't decided it yet. But you say you'd be willing to hold it in abeyance, but you won't hold it in abeyance. Anyway, I'm going to say I won't charge you for that time, but you go ahead and answer Judge Harris's question there. Certainly, Your Honor. So just a first clarification, I think just to clarify that it that we think is properly held in abeyance is the case, Your Honor. In terms of the way that the process, the approval typically works with CMS is that CMS does not have to approve the plan in order for it to take effect. And I think if the court looks at the analysis in the Douglas case, that highlights precisely how these sorts of plan amendments take place. And I apologize to the court, but Judge Harris, I do not recall your precise question to answer. It's fine. But can I ask you to go back on this taking thing? So as I understand your colleague, what they're saying is, you know, the taking is effectuated by EMTALA, and we know we can't seek to enjoin the taking itself. And we're not trying to do that. Our claim is just about the just compensation, the state law provision that denies us just compensation. And so that's what we would like to enjoin. And there's nothing in Nick or any other case that says we can't enjoin that. So why is that not right? I think that's not right on two fronts, Your Honor. First, just kind of the way takings claims work and the appropriate relief. And then second, the precise taking theory. So delving into the first point, unlike the Due Process Clause or the Equal Protection Clause, the Taking Clause does not protect people against certain activity. It does not protect them against the taking itself. It simply entitles them to just compensation. And the Supreme Court did nothing in Nick to displace the longstanding rule that the determination of what constitutes just compensation should be made by the sovereign who enacted the taking in the first place. So it's both a question of, you know, the proper place, and federal courts are not the proper place. But Nick was also clear that as long as just compensation remedies are available, injunctive relief will be foreclosed. So I think the idea of an injunction in the context of a taking itself is simply a mismatch here. But even indulging in their takings theory, the Trade Association's framing of the case is fatally flawed. First, it's well established that the Trade Associations cannot premise a takings claim on voluntary participation in a federal program such as Medicaid or Medicare. And then second, the Trade Association's own theory is that EMTALA is the entity that enacts the actual taking. I thought public hospitals have to participate, don't they? Public hospitals. They have to participate. And they have to run emergency rooms. And they have to provide services. And doctors have to do it as part of their oath. They have to provide services, whether they're getting paid or not. So I think it becomes a question of... What courts are talking about? Yeah, so I think that under the arguments raised in the briefing by the Trade Association is that it's EMTALA that because of EMTALA, they must treat all patients who walk through the door. But there's a well-established body of cases that show that participation in these programs is voluntary and that entities cannot premise a takings claim based on voluntary participation in Medicaid and Medicare. And we go through those cases in detail in our briefs, Your Honor. I think the second... I think another point problem with the takings theories raised by my friend on the other side is that they offer no principled reason for why the prior reimbursement rates were not takings, but these reimbursement rates are. They claim that the reason the challenge rates are not just compensation is because they do... It's because you're downcoding. That's what they say, that you have to downcode. You're not complying with the prudent layperson standard, which is fixed when the person comes into the emergency room. You're basing the coding on the diagnosis, the diagnosis, which results in the downcoding. That's how I was saying, if the federal code requires the prudent layperson standard, and you all repeal that in Virginia or require that to be changed, then you're falsifying the forms. Because they're supposed to be coded properly. They're supposed to be coded properly. They're supposed to have the 81 code or whatever it is, or the 82 code. When they go in, the 84 code or the 85 code, and you put them back to the 81 code or the 82 code. I think it bears noting precisely what the prudent layperson standard is, Your Honor. It's such that a prudent layperson could reasonably expect the absence of immediate medical attention to result in death or serious bodily injury without immediate medical attention. The list that's at issue here is a list of diagnoses that do not present these sorts of problems. That's the evaluation that took place, and that's how this list was compiled. This is a list of conditions that do not merit this sort of high-level emergency treatment. I think an example helps bearing that out. Somebody preventing with conjunctivitis, certainly EMTALA, if it's applicable, requires examination, and if there's a true emergency, stabilization. But it doesn't require extensive treatment of that conjunctivitis. At issue here is a question of that next step, that extensive treatment. And so this coding, that the reimbursement rates do not violate neither the prudent layperson standard, because, again, that's premised on a need for immediate medical attention that might result in serious death and death or serious bodily injury. But, again, I think to the extent there's a policy dispute about whether the list is the right list, whether there's an entry on there that should be in there that shouldn't be on there. I mean, these are all the sorts of policy questions that, and just generally whether the list itself was compiled properly and whether the new policy is consistent with Medicaid. That's what CMS was tasked by Congress to do, and CMS is doing that. What's being asked in this litigation is for a federal court to jump in and sidestep that. And I think for all the concerns that are laid out in the Douglas case, that's just not the right approach in this case. If the trade associations disagree with CMS's analysis of what the prudent layperson standard means, they certainly can seek relief as to CMS. And I do think it's worth noting that we do apply the prudent layperson standard because there's still, the reimbursement is still as an emergency. We don't dispute reimbursement as an emergency. It's just as an emergency at the 99281 rate, the different rate. Counsel, this is Judge Harris. Can I ask you sort of a slightly a field question? I'm sorry, the district court dismissed all of these claims, the preemption claim and the takings claim, as a matter of standing. And I think they got this theory from your motion that because the plaintiffs can't win on these claims, they can't get an injunction to enjoin a taking. And there's no enforceable right for which they would have a cause of action under 1983 for their preemption claim. That therefore, their injuries are not redressable and there's no standing. Is that the theory that you're advancing in front of us? That the plaintiffs don't have standing because they lose on the merits of their claim? I don't understand that. I think that's certainly the way the district court understood. That's the way you argued it to the district court, too, in fairness. That's where the district court got the idea. And so can you explain to me? I mean, I guess I don't mean to put you on the spot. Is that what you would like us to hold? That there's no standing in this case because there is no injunction available to stop a taking and also because there's no enforceable right on the part of providers under Section U2? So it follows from that, that they don't have standing because any injuries are not redressable? I think that's one avenue the court could go. That's not the only avenue the court could go. And I think there are numerous other avenues. Why is that an avenue that we could go down? Is there any support for the idea that if someone loses on the merits, they don't have standing? I think part of it is the idea of how takings claims generally work, whether that's kind of an available remedy. And I certainly recognize that that's kind of an incorporation of the merits in some way. And for that reason, there are various other avenues by which the court can inform and reasons why that there's a lack of standing here. One of the points that also hasn't been addressed is the representational standing issue. But I think an overarching point is that they're simply in the wrong court. That for the sovereign interest here and under 11th Amendment immunity, the proper venue for this case would be in state court. Are you familiar with Ex parte Young? Yes, Your Honor. Well? So I think Ex parte Young also, you know, the trade association's claim can't cleanly fit into Ex parte Young because 11th Amendment immunity does not work. So because of 11th Amendment immunity in the same way that it might, you know, be available for an equal protection or due process claim, that's simply because injunctive relief is just a better. They aren't suing for damages here. That's correct, Your Honor. They want equitable relief. That's correct, Your Honor. And that's a sort of relief that's just unavailable for takings claims. The takings clause permits just compensation, not injunctive relief. I do want to note one problem, you know, highlight before my time ends about the problem with the trade association's theory and just that they offer no principled way to justify why a reason for this to be a taking, but why other reimbursement, the prior reimbursement regime would not be a taking. They take as a given for purposes of this case that the prior rates are not, provide just compensation, but they provide no principled reason to justify that. Their theory is that there must be reimbursement for the professional time, facilities, supplies, and wages actually provided to patients. But even the CPT codes that they advance are not penny for penny compensation for the professional time, facilities, supplies, and wages actually provided to patients. This case is really about health care policy, not the takings clause, and the trade association's effort to fashion a case to avoid well-settled doctrines should be rejected and the decision below should be reaffirmed. Unless the court has any additional questions, we simply ask that this court affirm. Judge Wynn, Judge Harris, anything else? No, I'm fine, thank you. Thank you, Ms. Kalin. Mr. Kimberly. Thank you, Your Honor. If I may, I'll start out quickly by addressing Judge Harris's question about the proceedings below. I point the court to joint appendix page 210, which is from the oral argument in the case. It very clearly states, well, I'll just very quickly read. This is me talking now. It says, I understand the state to characterize our position as the view that we have earned these reimbursements. The state is taking them away, and that violates the takings clause. Let me be crystal clear, that is not our theory. Our theory is that the taking is the mandatory provision under EMTALA of emergency screening services in the emergency department. These hospitals and doctors are required by law to use their professional services and medical supplies and equipment to treat these individuals. They have no choice. That is the taking. I would point, Your Honor, also to the very first sentence in our reply brief in support of the motion for a preliminary injunction. This is docket 16, where it says, Virginia hospitals and physicians have a property interest in their labor supplies and facilities. They are compelled by EMTALA to provide their services and supplies for public use, and the budget items deny them just compensation for that taking. That's our theory through and through. It has been from the beginning. Judge Harris, you asked the question of my friend on the other side, whether Nick really applies here, given that the injunction that we're asking for is not an injunction against the taking itself. The answer is Nick can't possibly apply here. Because really what Nick confirms is all we're entitled to under the Fifth Amendment is just compensation. The budget items here systematically on an ongoing basis are denying us just compensation. And therefore, as I started out saying at the very beginning, the injunction we're asking for here operates at the second step of the takings analysis. And on this point, I'd point the court to the Colton case. This is a 2017 Seventh Circuit case cited at pages 27 to 28 of our opening brief. This is before Nick overruled Williamson County. And the Seventh Circuit there said, we do not read Williamson County to require resort to state court when state law unequivocally denies just compensation. The court went on to say that in that circumstance, quote, plaintiffs are entitled to prospective relief with respect to the just compensation element of the takings claim. And again, that is our theory in this case. My friend on the other side said that, pointed to cases from the Eleventh Circuit and the First Circuit, including Baker County and First Medical, indicating that participation in Medicare is voluntary. And therefore, that this can't be a compelled taking. But on that front, I would note that those cases didn't involve a certificate of need program like Virginia's, which mandate participation in Medicare and Medicaid. And they didn't involve allegations and evidence like we have here at paragraph 74 of the complaint, indicating straightforwardly that 74 percent of general acute care hospitals in Virginia are nonprofit and public and must participate in Medicare. So Baker County and First Medical are simply distinguishable on that basis. But then, of course, besides that, those cases predate the Supreme Court's decision in Horn. And I would say also DMAS has to be the right defendant in this case, and that's for two reasons. The first is the injunction that we request in this case would be an injunction that runs against DMAS. The injunction would say simply you may not enforce the budget items. It would be very unusual, I think, to sue federal agency on the ground that a state agency is following state law in a way that violates the takings clause. I don't see that that's – I mean, once CMS – if CMS approves these budget items, then you would sue the federal government and say you can't approve these budget items. You have – you, federal government, have taken our property through EMTALA, and now you have fixed it so we can't get just compensation. That seems like a sensible lawsuit. One defendant, one sovereign did both the taking and the approval of the lack of just compensation. I don't really – I mean, that's your whole point. It's a partnership, so go after the federal government for both things. Thank you, Judge Harris. I think the concern with that approach is exactly what Judge King was teasing out. That process will take many years, as the Douglas case itself shows, many years to work itself out. But that's what the court does allow in NIC. You have to wait until you've been denied the just compensation, and then you'll get it back. Well, but our point is that we're being denied $55 million a year in just compensation on an ongoing basis. This is not a one-off taking. This isn't the case where – may I complete my answer, Judge King? You can. Now we have another question. You keep going. I'll add, Your Honor. The fact that this is ongoing, I think, makes it different, and it makes the idea of waiting for the CMS process to work itself out impracticable, unless there's a preliminary injunction in place in the meanwhile, which we obviously would be happy to have. Counsel, can I – let me – I know Judge King has a question. This is my last question. So, I mean, I can – I understand your argument, I think. I don't think the district court ever addressed it, and whether the district court should have or not, I guess we can sort of figure out separately. But the district court didn't understand your argument, as you are now phrasing it on appeal. They just – the district court said, look, you're alleging that the downcoding provision itself constitutes a taking. That can't be enjoined. I'm moving on. If we were to think that under your new theory, an injunction would be available, wouldn't we send this back to the district court? Unless – I mean, maybe even the district court could consider in the first instance your theory that an injunction is available because you're not actually trying to enjoin the taking, because the taking wasn't tolerant. Maybe the district court should consider that theory in the first instance. Or maybe if we want to consider it and say, okay, okay, an injunction is available, wouldn't we go send this back to the district court to see if there has been a taking, particularly in light of the fact that your theory of the taking also has changed since the district court? You argue this was a taking under Penn Central, just a plain old regulatory taking. Now you're arguing it's a per se regulatory taking or a physical taking. So shouldn't we let the district court look at some of these new arguments first? Well, I would say, Your Honor, on the whole, I don't think it's a new theory. Again, JA-210 and the opening line of our opposition – excuse me, our reply on the PI motion. And I would say I think the material there for the per se taking and the citations and reliance on Horner are there for the court. Certainly if this court doesn't feel comfortable entering a reversal order with instructions to enter a preliminary injunction, we would certainly take as a fallback. But the district court didn't reach the preliminary injunction issue. Well, it didn't, Your Honor. And we would be happy for the court to reverse the district court on those grounds, explain that Nick doesn't apply in these circumstances, and send it back to the district court to consider whether a preliminary injunction is appropriate under the circumstances. That, so far as we're concerned, would be an appropriate outcome here. You're sort of a moving target, too, here. And I didn't mean to interrupt Judge Harris. You go ahead, Judge Harris. No, no, I'm sorry, Judge King. I'm finished. Judge King, let's turn it back. I wanted to know if Mr. Kimberley can articulate what relief he wants. We – so what we moved before the district court for and what we are asking for from this court in the first instance is for a preliminary injunction against – I mean, I want you to – I know what you've already asked for. And now you've heard the end of the oral argument. What would you like us to do? What do you want us to do? You haven't checked anything? I think a reversal with a remand to the district court. A reversal that would say that you have standing. A reversal that says that we have standing and that Nick is not a bar to this action, I think would be – That's what's not a bar to the action? The enunciation in Nick that injunctions against takings are not generally appropriate is not a bar to this action, not a bar to relief in this action because the relief that we seek is an injunction against a systematic denial of just compensation and not an injunction against the taking itself. I think that's all the court has to say. And in doing so, it would be making clear that – So you're withdrawing your request for an injunction from the court of appeals? Your Honor, I'm reading the bench. I'm not necessarily withdrawing the request. I have a sense that we're not going to get that. And that being the case – Well, then I'm asking if you're withdrawing it. I mean, I'm just trying to find out where you are at this point. No, our first request, Your Honor, is that this court, as it did in the League of Women Voters, remand with instructions to enter a P.I. If it isn't prepared to do that, we would be happy with a remand for the district court to consider. If one of us wants some additional briefing, how much time would you need? I think we could prepare additional briefing in 14 days. Or seven days. Would you want simultaneous briefing or would you want it to be seriatim? I think seriatim briefing is often a more useful, iterative approach. But certainly we'd be open to whatever – I'm not saying we do. But can you – The first thing you want is a ruling that you have standing, I assume. A ruling that we have standing. Yes, Your Honor. Okay, and then something from that. What would you do about this – that outfit that's supposed to be studied on this thing, CMS? So what – Yes, our position – And this relates, Your Honor, back to what Judge Harris was asking about as well. CMS is in the process of reviewing the budget items. It is a process that will take many years. The budget items, meanwhile, are being enforced. It's a process that will take several years? Yes, Your Honor. And, Douglas, it took three years. And already CMS – You mean they can't decide whether this downcoding thing is proper or not? It takes time. It looks to me like they're supposed to be experts. They could decide that in a couple hours. Well, I might have thought so too, Your Honor. Although, as a lawyer here at DC – You're asking us to do it immediately. Well, actually, Your Honor, all I'm asking for on behalf of my clients is a maintenance of the status quo while that takes place, which we think is only appropriate. Well, that's an injunction. That's what it's called, isn't it? Yes, a preliminary injunction. Yes, Your Honor. All right. So, if I may, there's just one other brief point I'd like to make, and that's that DMAS here is the entity that's turning the screws in an unconstitutional way. It's the one that's saying, if you don't like giving uncompensated care to Medicaid beneficiaries, it's on you to disenroll from Medicare or to close your ER. And in that sense, we think, really, certainly the reasoning of Horn applies here as to DMAS, and it's the appropriate defendant. And certainly, also, there is a principled way to differentiate this case from general complaints about below-cost reimbursements because, as the court in Horn itself said, the Constitution is concerned with means as well as ends. And here, for all the reasons we've given, we think the downcoding provisions are both preempted by you and working on constitutional taking, and we ask the court to reverse. Thank you, sir. Wait a minute. Judge Wynn, Judge Harris, do you have anything further? Nothing further. Thank you. No, thank you. Thank you very much, sir. Thank you, Your Honor. If we were in Richmond, where we'd like to be, we would come down and greet counsel and tell you we appreciate your work and thank you for it, and that you've done a good job. And we'll do that the next time you're there. Thank you very much. We'll see you another time soon. Madam Clerk, you can adjourn court. Yes, sir. Until tomorrow. This honorable court stands adjourned until tomorrow. God save the United States and the honorable court.
judges: Robert B. King, James A. Wynn Jr., Pamela A. Harris